Good morning. May it please the Court. My name is Matthew Henry. I practice in Austin, Texas, and I am counsel for the appellant CallerID4u. I will do my best to reserve three minutes of time for rebuttal. CallerID4u is a competitive local exchange carrier, or a CLEC, that provides access services to long-distance carriers like the appellees AT&T and Verizon. Beginning in August of 2016, CallerID4u brought suit in state court here in King County, Washington. You say you don't understand why they didn't pay, but you didn't have a tariff filed at the time, isn't that right? That is correct. And you didn't have an agreement with them at the time? For a portion of the time, there was no tariff and there was no written contract. So between April 2012 and September 28, 2012, my understanding is there was neither a tariff nor a contract. That is correct, Your Honor. However, under the FCC's Hyperion order, CLECs like CallerID4u are permissively de-tariffed. That means they do not need to have either a tariff or a written contract. But the FCC's ruling from access reform order and thereafter says, I don't know if they have the authority to do it, but we're bound by the Hobbs Act, not to address that question, but they say either you have to have a tariff or you have to have a negotiated agreement and otherwise the CLECs are not authorized to collect funds. So why was it irrational then for AT&T and Verizon not to pay? It seems very rational. That's an excellent question, Your Honor, and that drives right to the heart of this case because it goes to what the FCC held in Hyperion and then how they adjusted Hyperion in the CLEC access charge order. I didn't see anything saying that if you didn't have one or the other. I read so many opinions where the FCC repeats that almost verbatim. You have to have one or the other or you're not authorized. What happened in the CLEC access charge order, and if we remember the context, it was that CLECs were charging far above the ILACs rates and the FCC was concerned about these excessive rates. So what the FCC said is they set a benchmark and they said any charges above the benchmark must be pursuant to a written contract. Tariffs are not allowed above the benchmark. In the CLEC access charge order, the FCC did not address or make any change to the law regarding rates at or below the benchmark. They continued under Hyperion to be permissively deterrent and we know that because in the CLEC access charge order, the FCC said CLECs may provide service pursuant to a tariff at or below the benchmark. They did not say shall or must, they said may. Is there any FCC, can you point me to language in any subsequent, after the access reform order, any subsequent FCC order that says even if a CLEC doesn't have a tariff and doesn't have a Yes, Your Honor. In Farmers and Merchants, footnote 96, the FCC said just because a carrier did not have a written contract or a tariff does not mean that they are not entitled to collect inequity. And is that a CLEC opinion because in your briefs you were citing cell phones and pay phones and everything else? Yes, Your Honor, I believe that it was. And also, furthermore, there's another one which is directly at issue in this case, which is All-American II. And that's actually the decision where the trial court held that the FCC held that states cannot enforce implied contract cases. In footnote 4 of All-American II, the FCC expressly reserved judgment on whether or not equitable claims of quantum merit and unjust enrichment can be brought in state court. AT&T moved for those claims to be thrown out on jurisdictional grounds under the filed tariff. And the FCC said, no, we won't do that. We're going to reserve judgment on those issues for the damages proceeding because when we calculate damages, we are going to need to take into account the equitable value of those services. And that's where? That is footnote 4 of All-American II. So the FCC has said that in the absence of tariffs for CLECs, equitable claims can give rise to recovery. So is that All-American II? Yes, Your Honor. And that's binding on us? No, Your Honor, that is not. That is a decision out of the court. That is an important question because what the trial... So it says that they'll address these issues in AT&T's damages proceedings, if any. Correct, Your Honor. So it doesn't... So there's no ruling on this issue. What AT&T said was that those claims should be dismissed. And the FCC said, no, first we're going to find liability, and then in a subsequent proceeding, we're going to calculate damages. And at that point, that's when we would take into account the equitable value of the services that were rendered. Well, it doesn't say that. It says it'll address this claim and the damages proceeding, if any. Correct, Your Honor. It's reserving judgment. And what the FCC has said... So is that the strongest thing you have is that they didn't address it in this case? They didn't address equitable liability in this case? There are a number of cases as well where courts have held. Mettel, out of the Southern District of New York, is a very good one, where courts have held that even in the absence of tariffs or written contracts, SELACs can recover in equity. Okay. I didn't... All of the cases I saw in your briefs related to... They were either before the access reform order or were not the same, similarly situated. The Manhattan case we cited, it was from after the SELAC access reform order. And what case is that called? It's Manhattan. It's from the Southern District of New York. It was a case where a SELAC brought a tariff collection action, and the IXCs argued that because the traffic issue was VOIP, it therefore did not fall under the tariff. And the court said that may be so, but the SELAC is still allowed to recover in equity for the services it provided, and the court awarded damages to the plaintiff under quantum merit and unjust enrichment. So there is a split within the district courts regarding whether or not these state law claims are allowed. And if I may turn back to your Honor's question regarding whether or not the Enforcement Bureau decisions are ordered here was that the FCC's Enforcement Bureau held that states are forbidden from applying certain state law claims under state law in state courts. And that of course begs the question, from where does the FCC derive the power to tell the states what state law claims are allowed under state law? Does the FCC have the power to tell the states whether Section 203 imposing tariffing requirements or Section 160 forbearing from imposing tariffing requirements? Neither of those sections grant the FCC the power to pick and choose state law claims a la carte that will apply in state courts. And furthermore, the FCC has not, even if it had that power, has not delegated that power to the state courts. Okay. You argue that this Court's decision in RENOS stands for the proposition that 19.86.170 of the Washington Consumer Protection Act does not apply here. But that case was about false marketing practices. Here we're dealing with prices charged for a federally regulated transaction. Is that distinction dispositive? No, it's not, Your Honor, and that's a fantastic question. I'm glad you brought up NOS. So it's not clear why the trial court dismissed the CPA claims, whether or not it's because the appellees are pervasively regulated as a class or as appellees argue the specific practices at issue are regulated by the FCC. Taking appellees' position that the FCC does not have the power to impose tariffing requirements under state law, the FCC does regulate the specific practices at issue, their non-payment of access for access services. That would mean that what they're saying is the FCC regulates those non-payment practices. However, the FCC does not have jurisdiction over claims arising from non-payment. The FCC has said over a long period of years in cases, it's cited in All-American 1 and footnote 32, it is a string site a page long, they call them the collection action orders. The FCC has made clear that they do not have jurisdiction to hear claims arising out of non-payment of access services because that does not state a violation of the act. If the practices at issue are not within the FCC's jurisdiction, then they are not regulated by the FCC, obviously. So if the FCC says, which they do, that you don't have authority to collect if you don't have a tariff or a contract, then how can you have, get, as some district courts have said, how can you get payment for that, for services, in the absence of those? Excellent question, Your Honor. In this court, the Ninth Circuit has a fantastic body of case law on this issue. In the absence of tariffs, state contract law controls, including state law regarding implied contracts. So in Ting, it was mandatory de-tariffing, I assume you're referring to Ting, and there was no FCC control for, at all. So here, we have not only this permissive tariffing regime, but we have a specific ruling by the FCC that you're not entitled to collect if you don't have one or the other. That wasn't the case in Ting. In Ting, that was mandatory de-tariffing, but in either instance, whether, if a C-like contract was required or not, it was mandatory de-tariffing, if a C-like contract chooses to operate without a tariff, makes that choice, foregoes tariffing at their own discretion, then the filed tariff doctrine, under Ting's analysis, the filed tariff doctrine is inapplicable, and what fills the void is state contract law. So we would have to ignore the FCC's ruling that it's either one or the other and you don't have authority for the third? No, Your Honor. What you would consider is the FCC's Hyperion order. The Hyperion order made clear that C-likes have the ability to file de-tariffs and they can file at or below the benchmark and they can file them as they choose or not. And so if C-likes have the ability to file those, under this court's case law regarding state law filling the void and de-tariff situations, state contract law fills the void and without a tariff, C-likes can recover inequity under the Quantum Merit and Unjust Enrichment Claims. Do you want to reserve your time? Yes, Your Honor, I would. Thank you. Good morning. Good morning, Your Honor. May it please the Court, Josh Branson for Appellees Verizon and AT&T. Judge Ikuda, I thought you got it exactly right. The FCC has been clear for many years that a competitive local exchange carrier like CallerID4U has one of two routes to recover access charges. They can negotiate a contract or they can file a valid tariff. There's no dispute anymore in the present posture of this case that CallerID4U did neither. So under the terms of the FCC's, the plain text of its rulings, it is foreclosed from recovering access charges through some other means. So is that binding on us? The FCC repeats over and over, you can do one or the other, and otherwise you don't have authorization to collect funds. But why aren't state quantum merit equitable actions given that they did provide services for these months? Are we bound by this FCC statement in their adjudication? I think what the FCC statement does is it is in effect an interpretation of Section 203 of the Communications Act, which forbids carriers from charging for services outside of a filed tariff. Now the FCC has partially forbeared from that requirement for competitive local exchange carriers by saying if you have a negotiated contract, we're not going to enforce Section 203. Is 203 applicable to CLEX? I thought they were like connecting carriers and there's been some language in FCC orders saying we don't know. We don't know how we control them. We just do. There has been some language in some FCC orders, I know what you're talking about, saying we're not exactly sure what the precise statutory basis is for certain regular authority that we're exercising over them. But that issue is not really before this Court. It hasn't been briefed. As you mentioned when questioning my colleague, the proper way to adjudicate those issues is you need to file a petition for review from All-American. Not only was that not done, so the Hobbs Act would preclude jurisdiction, but they didn't raise any of these arguments. Well, is All-American 2 binding on our decision here? Yes, binding in the sense that it is an authoritative construction of the Communications Act. And that is one of the places that the filed rate doctrine really does a lot of work in this case. Because the purpose of the filed rate doctrine is to prevent courts from intruding on the domain of expert agencies. And telecommunications rate setting is something that is a paradigmatic example of something we leave to the expert agencies like the FCC. So not only do I think it's binding as a matter of the procedural posture of this case, but I think the whole purpose of the filed rate doctrine is to prevent courts sitting in equity from second-guessing the policy judgments that have been reached by expert agencies like the FCC. What about footnote 4, the opposing counsel, as that holds open the question whether you could recover charges under equitable theories? So two answers to that, Your Honor. First is I think footnote 4 was slightly mischaracterized. That was not something that the commission did in terms of bifurcating damages. That was something that AT&T elected to do given the procedural structure of the complaint proceeding before the FCC. So you can see it in footnote 4 itself. It says AT&T elected to bifurcate its liability and damages claims. But the real answer is we know how All-American ended now, because as we submitted in our 28J letter, the damages proceedings has been concluded. And in that All-American 3 order, the FCC said at paragraph 13 in footnote 50 that All-American got nothing. And All-American tried to raise this exact argument. They said we're entitled to something. We're entitled to nothing because we provided a service and state law gives us a right, even though we violated our tariff. And the commission said no. Under the two-path framework that we articulated in 2001 and that we reiterated in All-American 2, All-American was entitled to nothing. So I think footnote 4 might have been an interesting argument had we not known how the story ends. And the way that case came out and indeed the way all of the commission's cases have come out, the competitive local exchange carrier gets nothing when it doesn't follow the terms of a valid tariff or negotiated contract. To address some of the cases that my colleague cited, the farmers case, that was an incumbent local exchange carrier. That was not a competitive local exchange carrier. So in farmers, farmers was not subject to this two-path regulatory framework on which we rely in this case. The Manhattan Telephone Company case out of the Southern District of New York, it was Judge Rakoff. There I think what dictated the outcome was that it was VOIP traffic, which is IP traffic. And for years the FCC has studiously refused to rule whether VOIP traffic is even a telecommunications service. It was subject to the access charge regime. So there was a big question in that case about whether VOIP services even fell under the core rubric of the regulatory framework that we're relying on. And what Judge Rakoff said was, I don't want to get into the middle of that because the FCC has conspicuously declined to answer the question. And so the most sensible way forward for me in that case was to say, I'm going to treat this under state law and use equitable principles to still give the case. And I'm going to give the carrier some recovery. We don't have that here. This is all circuit switch traffic. This falls within the heartland of what All-American 2 in paragraph 37 was talking about when it said, we need, because there is a history of competitive local exchange carriers abusing the access system, that was the 2001 order, the FCC has fairly strictly regulated how they can collect these type of charges. And the reason that they're not allowed to simply do what CallerID4U did here, which is operate without a tariff for a few months, then file a tariff, try and bill us under the tariff, and then after we called them out on it and said, you're not actually providing a tariff service, what you're doing, our defense all along was that this is a sham service that's whole purpose is to create access charges. So they induce our customers, our long-distance customers, to have to call their number so that CallerID4U can connect our call to this database and charge us access services. But that's not before us. I mean, the claim that it was simulated at whatever traffic is not really, I didn't see that in the briefing. Well, it is in a sense, Your Honor, in that that was our defense to the tariff collection claim. And that is at 176 of the electronic record.  So that's the litigation we thought we were getting below, is that in these cases, these type of issues always get litigated under a tariff collection claim. You know, all the district court cases we cited in our brief, the district judge dismisses the state law claims at the outset, and then the competitive carrier proceeds to litigate the tariff collection claim. CallerID4U has voluntarily dismissed that claim with prejudice. That's the post-92812 tariff claim?      All right. All right. All right. All right. All right. So that's actually the bulk of the traffic. But the reason they said so in their brief, and this is at page 26 of their opening brief, page 18 of the reply, they say the premise that we're now proceeding on is that our tariff didn't actually authorize the charges that we were levying on AT&T and Verizon. I mean, because they say, you know, the reason that we are entitled to these alternative claims is they fell outside the tariff. That is, you know, essentially what happened in All-American. It's basically the same thing where All-American tried to bill AT&T under a tariff. It turns out that it was a sham. It wasn't actually doing what the tariff said they were doing. And the commission came down on them and said that violates, this is exactly why we've articulated this two-path framework that's existed since 2001. It's that type of behavior that this regulatory regime is designed to deter. So opposing counsel says the Hyperion, they're relying on the Hyperion order and that it was not overruled or superseded. Can you address that? Sure. So the Hyperion order at this point is 20 years old. And I think the best way to read the 2001 order, which is the principal order we rely on, is that it was a partial reversal of the Hyperion order. And you can tell, the reason is that the 2001 order surveyed the intervening evidence that happened between 1997 and 2001. And said, you know what, in Hyperion, we initially were inclined to completely deregulate competitive local exchange carriers because we don't think they have market power. We think the competitive forces will discipline their pricing. In 2001, the FCC said, you know, turns out we were wrong. That competitive local exchange carriers were abusing the freedom that they'd gotten under the Hyperion order. And that's why the FCC established this framework. And I think if you want a real simple way through this, you just read paragraph 37 of All-American II and you read paragraph 10 of the Great Lakes Order. The FCC recently, in no uncertain terms, says, you know, whatever we may have said in Hyperion 20 years ago, the rule today is very clear. You have to negotiate a contract. You have to file a tariff. If you don't do one of those things, you can't get anything. And, you know, I thought the most telling part of my colleague's reply brief was on page 14, where they said All-American II itself was an inartful reading of the Commission's own prior orders. And, you know, I think that really kind of boils this down to the essence, which is we're asking the court to apply what the Commission actually says that it meant. And to, you know, to accept caller ID for use argument, I think you have to really rewrite what they've actually said in more recent years in light of the Hyperion order. And that's something that I don't think you can do. Judge Callahan, to address your question about the NOS case, I think I'm pronouncing it correctly. In my view, NOS- I was calling everyone Klecks or whatever instead of Clexo or whatever. I'm trying to avoid the telecom lingo while I'm up here. But the NOS case, I think, is really not very relevant to the issue before the panel. Because in NOS, the key distinction was that the defendant was the tariff filer. It was the long-distance company's retail customers that were suing the long-distance company and saying, you lied to us, you got us to sign up with you for long-distance service by lying about what you were going to do. And NOS allowed certain of those claims to go forward. I think the analogy to this case would have been, what would have happened in NOS if NOS had filed a tariff, if NOS had not complied with its tariff and then had sued its own customers trying to collect money under an unjust enrichment theory? And I have no doubt the court would have come out against that and said, that is preempted not only by the two-path framework the FCC has articulated, but also by the filed rate doctrine. In saying that the FCC order, with its two-path order, and saying you don't have authorization, is binding on the Zlex and that state law doesn't apply, is this a form of preemption? Because I know we have various rulings on preemption, but I don't know exactly what to call that. I think preemption is an apt word for it. And you look at the filed rate doctrine cases and it often refers to it as preemption. And I think the reason preemption is an apt way to describe it is because the federal agency here has exercised its expert authority to dictate to competitive local exchange carriers how they're allowed to bill for services. And these state law claims, by necessity, by asking a judge, for instance, to assess the reasonable value of the telecommunications service by invoking equitable principles, that I think it's really a form of conflict preemption in that it usurps the FCC's authority and the regulatory regime that it's put into place. A lot of the filed rate doctrine cases, for that reason, do talk about it in terms of preemption. I think you could talk about it in terms of just Section 203 of the Act. You know, I — Well, but does the filed rate doctrine, bar CAL, call ID4U state law claims for the period before it filed the tariff in September 2012? I think in terms of the filed rate doctrine itself, that's a closer question for the period in which there's not a tariff on file. I would say, yes, it does. And the reason is — Is that preemption the reason there, or what is the reason? Well, the easiest reason there is this FCC two-path framework that we've been discussing. It's very clear that if you don't have a tariff and you don't have a contract, a competitive local exchange carrier cannot bill. So that is the — that is a very easy way to resolve it without really needing to invoke the filed rate doctrine. But I do think the filed rate doctrine is important primarily for the principle that underlies it, which is that judges should not engage in rate setting for telecommunications services. And, you know, I've explained the reasons that that's true, that you don't want judges intruding on the domain of the expert agency. So I think even for the period where they elected not to file a tariff in violation of federal law, the filed rate doctrine would still apply. But I think the easiest way for the court to write the opinion for that time period is to rely on the all-American framework that it established interpreting Section 203 of the Act. And I think at the end of the day, yes, it is a preemption. It is a preemption argument. Thank you. Your time is almost expired, so you should wrap up. Unless the panel has any further questions, I'm happy to rest. I think we don't have further questions. Thank you. Thank you, Your Honors. I want to take for a moment this notion of the two-path framework. We dispute that there is a two-path framework, but let's assume it exists. Again, I want to emphasize, this begs the question, where in the world does the FCC get the power to tell states which state law claims they can enforce in state courts under state law? He says the supremacy clause. He says preemption. I would refer the court to Section 414 of the Communications Act, the Savings Clause, where Congress said all common law remedies are preserved. All. The FCC has no power to cherry-pick state law claims that can apply against long-distance carriers like AT&T and Verizon and exclude others. This is a question of federalism, but also about the powers of the administrative state. It's an important question, and the court needs to resolve this. So if there was a tariffed rate and a state said, we think that the SELEC is entitled to more, they could authorize the SELEC to get more than the filed rate. Is that your theory? No, Your Honor, because in this circuit, the Ninth Circuit, has been clear when there is a tariff, state law claims are preempted. When there's an applicable tariff enforced that covers— Wait, wait. If everything is saved, if all state remedies are saved, then under the statute— The case law has been clear, Your Honor, that that does not apply to when there is a tariff. That case law goes back to the railroad era. Okay, so the literal language of the savings clause is not followed in the courts. Is that my understanding from what you're saying? Yes, Your Honor. There is preemption when there is an applicable tariff. Okay, so there can be preemption, even notwithstanding the savings clause. There can be in that limited instance, but Congress has never granted, and the courts have—the Congress has never granted that the FCC has the power to cherry-pick state laws that can apply against long-distance carriers. I have one more point. Rate setting. My colleague says that if you were to award the equitable value of the services, this court would be—or the trial court would be engaging in rate setting. That is not true. Under Metrophones, the courts are allowed to apply the FCC-established benchmark rate, which is presumed just and reasonable as a matter of law. That is the rate that would be applied. That would be the measure of damages. There would be no rate setting involved. There would be no reference to the tariff. The tariff would be completely ignored. I have one further point. All-American III. I think my colleague may be disappointed if you read it more closely. The court again reserved judgment on whether or not equitable claims can be recoverable for CLEX because it said this was a sham arrangement, therefore there is no benefit conferred. We still do not yet need to address the equitable value of the services that were provided to the long-distance carrier. Thank you both for your argument. I speak for myself, but I think the argument was very helpful. You're both very knowledgeable. And if I was picking out who the lawyers were, I'd pick the two phone lawyers. And you coordinated your ties today. But you both gave a very helpful argument to the court. We appreciate that. The matter will stand submitted. This court will be in recess until tomorrow at 9 a.m. Thank you.
judges: Fernandez, Callahan, Ikuta